UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

LA FAMILIA PRIMARY CARE, P.C.,　　　　　　　　　　Case No. 23-10566-t11

　　　　Debtor.

# OPINION

　　　　Before the Court is Debtor's motion for a ruling that no patient care ombudsman need be appointed in this bankruptcy case. The United States Trustee ("UST") objects and contends that an ombudsman is necessary. The Court took evidence and heard arguments of counsel at a final hearing. It now rules that appointment of an ombudsman is not necessary for the protection of patients.

A.　　Facts.[1]

　　　　The Court finds:[2]

　　　　La Familia Primary Care, P.C. ("La Familia" or "Debtor") is a professional corporation formed in 2006. It provides primary medical care to patients in and around Raton, New Mexico. Dr. Misbah Zmily owns Debtor and is its only medical doctor. Dr. Zmily graduated from the University of Jordan in 1991. He did a residency in internal medicine at the University of Illinois and was awarded a medical license in 1996. He began his medical practice in Raton, a town of about 6,000 residents in northern New Mexico. Dr. Zmily has practiced in and around Raton ever since.

---

[1] The Court takes judicial notice of its docket *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may sua sponte take judicial notice of its docket and of facts that are part of public records).
[2] Some of the Court's findings are in the discussion section of the opinion. They are incorporated by this reference.

Dr. Zmily testified that five years ago there were eight doctors in the Raton area, but that now he is the only one left.

Dr. Zmily is board certified in internal medicine and, through Debtor, provides office-based primary medical care for adults. In addition to Dr. Zmily, Debtor employs a physician's assistant and a registered nurse practitioner. Debtor also provides medical care to a nursing home in Springer, New Mexico (population 1,300) and a Raton nursing home. Finally, Debtor has a contract with a local high school to visit once a week and provide medical care to the students. A large percentage of Debtor's patients are on Medicare[3] or Medicaid.

In 2020, pharmaceutical company BioLab Sciences approached Dr. Zmily about its amniotic fluid-based injections for the treatment of osteoarthritis. BioLab provided Dr. Zmily with literature detailing FDA approval of the fluid and Medicare's conditional approval of the treatment for certain patients. Dr. Zmily was persuaded that the injections might help some of his patients, especially those who were not good candidates for surgery. He began offering the procedure to these patients. If Dr. Zmily determined that a patient might benefit from the amniotic fluid-based injections and the patient was interested, Dr. Zmily would submit his patient notes to BioLab for pre-approval. If BioLab approved, it would ship the medication to Debtor. BioLab charged Debtor about $4,000 for each treatment. Dr. Zmily would administer the treatment and bill Medicare for the approved cost, about $4,400. Medicare paid the bills as submitted. La Familia made about $300-500 per injection.

---

[3] Medicare is a governmental national health insurance program administered by the Centers for Medicare and Medicaid Services, an agency of the Department of Health and Human Services. For ease of reference, it and the administering agency will be called "Medicare."

Some of Dr. Zmily's patients showed marked improvement from the BioLab treatments. Dr. Zmily believed and still believes that the injections provided a substantial benefit to his elderly osteoarthritic patients. Dr. Zmily also testified that the patients suffered few or no side effects.

Medicare, however, came to the opposite conclusion. In January 2022, Medicare notified Debtor that it would no longer pay for BioLab's amniotic-fluid treatment. Debtor promptly stopped administering it. That was not the end of the story, however. Under Medicare's reimbursement policies and procedures, Medicare asserted the right to "claw back" all the payments it had ever made to Debtor for the BioLab treatments, including the money Debtor had paid to Biolab. The claimed clawback totaled about $3.6 Million, plus interest. To collect the money, Medicare began setting off what it owed Debtor for treating Medicare patients. The setoff caused Debtor to lose most of its cash flow, prompting the filing of this bankruptcy case on July 19, 2023.

To date, there have been no patient complaints about the BioLab injection treatments, nor any reason to think that any of Debtor's patients might have claims against Debtor because of the injections.

Debtor enjoys a good reputation in the community. Neither Dr. Zmily, its other practitioners, nor Debtor have had any malpractice complaints against them since Debtor's inception. There is no evidence of substandard patient care, improper record-keeping, or privacy violations. There is no evidence that the bankruptcy filing has interrupted or adversely affected Debtor's patient care.

Based on the budget submitted with its cash collateral motion, Debtor operates on a very thin margin and does not have regular excess cash with which to pay for additional professional services. Additional administrative expense could jeopardize Debtor's reorganization and could cause it to shut down. Loss of "the last doctor in town" would be a severe blow to Raton's residents,

-3-
Case 23-10566-t11    Doc 55    Filed 08/17/23    Entered 08/17/23 14:20:39 Page 3 of 14

as well as the nursing home residents in Springer and Raton who depend on Dr. Zmily and Debtor's services.

B. <u>Patient Care Ombudsman</u>.

Section 333(a)(1)[4] provides:

> If the debtor in a case under chapter 7, 9, or 11 is a health care business, the court shall order, not later than 30 days after the commencement of the case, the appointment of an ombudsman to monitor the quality of patient care and to represent the interests of the patients of the health care business unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case.

The Court must determine whether Debtor is a health care business and, if so, whether it is necessary to appoint a patient care ombudsman to protect Debtor's patients.

C. <u>Debtor is not a "health care business."</u>

"[H]ealth care business" is defined in § 101(27A):

> The term "health care business"--
>     (A) means any public or private entity (without regard to whether that entity is organized for profit or not for profit) that is primarily engaged in offering to the general public facilities and services for--
>         (i) the diagnosis or treatment of injury, deformity, or disease; and
>         (ii) surgical, drug treatment, psychiatric, or obstetric care; and
>     (B) includes--
>         (i) any--
>             (I) general or specialized hospital;
>             (II) ancillary ambulatory, emergency, or surgical treatment facility;
>             (III) hospice;
>             (IV) home health agency; and
>             (V) other health care institution that is similar to an entity referred to in subclause (I), (II), (III), or (IV); and
>         (ii) any long-term care facility, including any--
>             (I) skilled nursing facility;
>             (II) intermediate care facility;
>             (III) assisted living facility;
>             (IV) home for the aged;
>             (V) domiciliary care facility; and

---

[4] Unless otherwise indicated, statutory references are to 11 U.S.C.

> (VI) health care institution that is related to a facility referred to in subclause (I), (II), (III), (IV), or (V), if that institution is primarily engaged in offering room, board, laundry, or personal assistance with activities of daily living and incidentals to activities of daily living.

The definition of health care business was added as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Section 101(27A) is not easy to parse. In particular, courts applying the definition have particularly with two questions: first, must a debtor come within both subsections (A) *and* (B) to be a health care business, or is it enough to come within either subsection; and second, if it is enough to come within either subsection (A) *or* (B) and a debtor seems to qualify under subsection (A), must the debtor's business be similar to the businesses listed in subsection (B)?

As a preliminary matter, it is useful to know that the Bankruptcy Code's drafters, when listing nonexclusive examples of a defined term, sometimes write "includes A, B, C, *and* D" rather than "includes A, B, C, *or* D." For example, § 1112(b)(4) contains a nonexclusive list of "causes" for dismissal or conversion of a chapter 11 case. After the penultimate example, the drafters used "and" rather than "or." For other examples of this drafting style, see §§ 101(31(E), 101(49), 330(a)(3), 362(c)(3)(C), 503(b)(1), 557(d), 707(a), 741(4)(A), 761(10)(A), 783(b), 1208(c), 1521(a), and 1527. While this usage has been criticized, *see, e.g., In re TCR of Denver, LLC*, 338 B.R. 494, 498 (Bankr. D. Colo. 2006), it makes as much sense to end a nonexclusive list of examples with "and" as with "or." In this context, "and" means "and also includes," while "or" means "or, as another example." Both are intelligible.

    1.    <u>A debtor coming within subsection (A) *or* (B) is a health care business</u>. Case law is split on whether a debtor must satisfy both subsections (A) and (B) to qualify as a health care business. In *In re Banes, D.D.S.*, 355 B.R. 532, 534 (Bankr. N.D.N.C. 2006), the court found that

-5-
Case 23-10566-t11    Doc 55    Filed 08/17/23    Entered 08/17/23 14:20:39 Page 5 of 14

["[b]ecause every section of this statute is connected by the conjunctive, a health care business must meet the requirements of every subsection to require the appointment of an ombudsman." Similarly, the court in *In re William L. Saber, M.D., P.C.*, 369 B.R. 631, 636 (Bankr. D. Colo. 2007) held that "it is important to note the subsection of § 101(27)(A) and of subsubsection (B) are connected by the conjunctive. Thus, a debtor who is a "health care business" must meet every requirement under both subsections for a patient care ombudsman to be appointed."

In contrast, in court in *In re Aknouk*, 648 B.R. 755 760 (Bankr. S.D.N.Y. 2023) held that "there is nothing in the text to indicate that the statute should be read conjunctively." Likewise, in *In re Smiley Dental Arlington, PLLC*, 503 B.R. 680, 685 (Bankr. N.D. Tex. 2013), the court held that "[t]he language in section 101(27A) (B) is inclusive of the specific entities listed and other similar entities, but not exclusive of other business entities meeting the test under section 101(27A)(A)."

The Court agrees with *Aknouk* and *Smiley Dental* that an entity is a health care business if it comes within either subsection (A) *or* (B). If all the "ands" in § 101(27A) are construed as conjunctions, very few entities would qualify as health care businesses. For example, homes for the aged, hospices, and home health agencies do not provide facilities and services for the treatment of injury, deformity, or disease. They would not be health care businesses under this construction. More to the point, the strictly "conjunctive" reading would require that hospitals also be long-term care facilities, and vice versa, as well as qualifying under subsection (A). The number of health care businesses under the conjunctive interpretation approaches zero.

Because, as noted above, the Code drafters sometimes used "and" to mean "and also includes" when listing examples of things that are "included" in a defined term, the better construction of § 101(27A) is:

> The term "health care business"--
>> (A) means any public or private entity (without regard to whether that entity is organized for profit or not for profit) that is primarily engaged in offering to the general public facilities and services for--
>>> (i) the diagnosis or treatment of injury, deformity, or disease; and[5]
>>> (ii) surgical, drug treatment, psychiatric, or obstetric care; and
>> (B) *also* includes--
>>> (i) any--
>>>> (I) general or specialized hospital;
>>>> (II) ancillary ambulatory, emergency, or surgical treatment facility;
>>>> (III) hospice;
>>>> (IV) home health agency; and *also includes*
>>>> (V) other health care institution that is similar to an entity referred to in subclause (I), (II), (III), or (IV); and *also includes*
>>> (ii) any long-term care facility, including any--
>>>> (I) skilled nursing facility;
>>>> (II) intermediate care facility;
>>>> (III) assisted living facility;
>>>> (IV) home for the aged;
>>>> (V) domiciliary care facility; and *also includes*
>>>> (VI) health care institution that is related to a facility referred to in subclause (I), (II), (III), (IV), or (V), if that institution is primarily engaged in offering room, board, laundry, or personal assistance with activities of daily living and incidentals to activities of daily living.

Under this construction, the word "includes" at the beginning of subsection (B) applies to "health care business," rather than to subsection (A). Thus, the section should be read: "health care business" means [the definition in subsection (A)] and also includes [the examples of hospitals and long-term care facilities in subsection (B)]. That is the construction that makes the most sense. The drafters apparently wanted § 331 to apply to hospitals, long-term care facilities, and also to debtors coming within the subsection (A) definition.

---

[5] The Court considered whether Congress intended this particular "and" to be an "or." Because it is not at the end of a nonexclusive list, however, and because it restricts the scope of health care businesses subject to the appointment of a patient care ombudsman, the Court concludes that Congress intended the conjunctive here, not the disjunctive. The case law, discussed below, uniformly agrees.

2. <u>Debtors coming within subsection (A) need not be similar to hospitals or long-term care facilities</u>. The case law also is split on whether debtors that come within subsection (A) must be similar to the businesses listed in subsection (B). In *Banes*, for example, the court held that "the types of businesses listed [in subsection B] are all of such a similar nature in that they provide both housing and treatment ... that it is difficult to imagine that the legislature would have intended a business that is so fundamentally different, such as an outpatient dental practice, to be read into the statute." 355 B.R. at 535. Similarly, in *In re 7-Hills Radiology, LLC*, 350 B.R. 902, 905 (Bankr. D. Nev. 2006), the court held that "subparagraph (B) of Section 101(27A) would seem to indicate a restrictive range for health care businesses." Finally, the court in *In re Medical Associates of Pinellas, L.L.C.*, 360 B.R. 356, 361 (Bankr. M.D. Fla. 2007)), held that "the examples included in subparagraph (B) appear to contemplate something more than a doctor's office . . . ." for an entity that qualifies under subsection (A).

> Disagreeing with this interpretation, the *Smiley Dental* court held:
>
> At the Hearing, Debtors and the U.S. Trustee advocated that the court should follow the second line of cases applying section 101(27A) and read into the statute an element of direct and ongoing contact with patients while providing shelter and sustenance. By comparing the similarities of the entities listed in subparagraph (B) of section 101(27A), this second line of cases has created an inpatient treatment requirement for health care businesses.
> . . . .
> Requiring this judicially created element, which does not appear in section 101(27A), misconstrues the statute. The language in section 101(27A)(B) is *inclusive* of the specific entities listed and other similar entities, but not *exclusive* of other business entities meeting the test under section 101(27A)(A). *See* 11 U.S.C. § 102(3) ("In this title ... 'includes' and 'including' are not limiting.") . . . .

503 B.R. at 687-88. *See also Aknouk*, 648 B.R. at 763 ("the court declines to read an inpatient services requirement into the definition of a health care business in section 101(27A)").

Again agreeing with *Aknouk* and *Smiley Dental*, the Court does not construe subsection (A)'s application to be limited to businesses "like" those enumerated in subsection (B). For one thing, it is hard to know what the subsection (B) business are "like." Some are in-patient care facilities (hospitals and homes for the aged), but others, e.g., [home] hospice, home health agencies, and ambulatory surgical treatment facilities, are not. Furthermore, if Congress intended to limit the definition of health care business to entities like the ones in subsection (B) (whatever that might be), it could have omitted subsection (A) entirely; the "catch-all" subclauses (B)(i)(V) and (B)(ii)(VI) would have been sufficient. The *noscitur a sociis*[6] interpretation of *7-Hills Radiology* is interesting but ultimately unpersuasive because the businesses listed in subsection (B) are not all similar to each other.

3. <u>Applying subsection (A) to Debtor</u>. The UST does not contend that Debtor comes within subsection (B), and the Court agrees. The UST does argue, however, that Debtor comes within subsection (A).

As stated in *Pinellas*:

subsection (A) of the definition of health care business in section 101(27A) requires the existence of the following four elements in order for a debtor to qualify as a "health care business":

1. The debtor must be a public or private entity;

2. The debtor must be primarily engaged in offering to the general public facilities and services;

3. The facilities and services must be offered to the public for the diagnosis or treatment of injury, deformity or disease; and

4. The facilities and services must be offered to the public for surgical care, drug treatment, psychiatric care or obstetric care.

---

[6] "Roughly," [*noscitur a sociis* means] 'it is known from its associates.' . . . . Under this canon, courts look to the language surrounding—or associated with—the language in question to determine the meaning of a disputed word or phrase." 350 B.R. at 904.

360 B.R. at 359; *see also Saber*, 369 B.R. at 636-37 (citing and following *Pinellas*); *In re Alternate Family Care*, 377 B.R. 754,757 (Bankr. S.D. Fla. 2007) (same); *Smiley Dental*, 503 B.R. at 687 (same); *Aknouk*, 648 B.R. at 763 (same).

Debtor clearly satisfies the first three elements. The question is whether Debtor provides facilities and services to the general public for surgical care, drug treatment, psychiatric care, or obstetric care. That is more doubtful. Debtor does not provide surgical care, drug treatment,[7] or obstetric care, which leaves only psychiatric care. Dr. Zmily testified that he sometimes prescribes antidepressants to patients. While the UST argued that prescribing antidepressants is providing psychiatric care, that seems a slender reed. Dr. Zmily is not a psychiatrist or psychologist. Debtor does not provide counseling services. Most people do not view primary care physicians as providing psychiatric care. It is a close question, but the Court rules that prescribing antidepressants, without more, is not tantamount to providing psychiatric care. Debtor, therefore, is not a health care business.

D.  <u>Appointing a Patient Care Ombudsman is Not Necessary to Protect Patients</u>.

Even if Debtor were a health care business, the Court would have the discretion not to appoint a patient care ombudsman if the appointment was "not necessary for the protection of patients under the specific facts of the case." § 333(a)(1).

To determine the necessity of an ombudsman, courts weigh the following factors:

1. The cause of the bankruptcy;
2. The presence and role of licensing or supervising entities;
3. Debtor's past history of patient care;
4. The ability of the patients to protect their rights;

---

[7] "The Court views Congress' reference to "drug treatment" as applying to facilities that treat drug addiction or abuse. The interpretation suggested by the U.S. Trustee [the writing or dispensing of prescriptions] would render meaningless the balance of section 101(27A)(A)(ii) because virtually all areas of medical treatment involve the prescription of drugs . . . ." *Pinellas*, 360 B.R. at 360 n.3; *Smiley Dental*, 503 B.R. at 686 (quoting *Pinellas* with approval).

-10-
Case 23-10566-t11    Doc 55    Filed 08/17/23    Entered 08/17/23 14:20:39 Page 10 of 14

     5.     The level of dependency of the patients on the facility;
     6.     The likelihood of tension between the interests of the patients and the debtor;
     7.     The potential injury to the patients if the debtor drastically reduced its level of patient care;
     8.     The presence and sufficiency of internal safeguards to ensure appropriate level of care; and
     9.     The impact of the cost of an ombudsman on the likelihood of a successful reorganization.

*Alternate Family Care,* 377 B.R. at 758; *see also In re Valley Health Sys.*, 381 B.R. 756, 761 (Bankr. C.D. Cal. 2008) (citing and following *Alternate Family Care*); *Aknouk*, 648 B.R. at 761 (citing *Alternate Family Care* and *Valley Health*). "The weight to be accorded to each of the *Alternate Family Care* factors in making a determination whether to appoint a patient care ombudsman is left to the sound discretion of the court." *Valley Health*, 381 B.R. at 761.

Courts also considers these additional factors:

     1.     The high quality of debtor's existing patient care;
     2.     The debtor's financial ability to maintain high quality patient care;
     3.     The existence of an internal ombudsman program to protect the rights of patients, and/or
     4.     The level of monitoring and oversight by federal, state, local, or professional association programs which renders the services of an ombudsman redundant.

*Valley Health* at 761, citing 3 Collier on Bankruptcy ¶ 333.02, at 333–4 (15th ed. 2007).

"Debtors found to be health care businesses bear the burden of establishing that the appointment of a Patient Care Ombudsman is not necessary." *Aknouk*, 648 B.R. at 761, citing *In re Starmark Clinics, LP*, 388 B.R. 729, 734 (Bankr. S.D. Tex. 2008).

Assuming for the sake of argument that Debtor is a health care business, the Court will weigh each of the 13 factors to determine whether the appointment of a patient care ombudsman is necessary:

| Factor | Discussion |
|---|---|
| The cause of the bankruptcy. | Debtor filed this case because Medicare changed its position on amniotic fluid-based injections and now claims that Debtor owes it $3.6 Million, an amount Debtor clearly cannot pay. There is no evidence of a patient care-related cause for the filing. |
| The presence and role of licensing or supervising entities. | Debtor is supervised by the New Mexico Medical Board, Medicare, the U.S. Department of Health and Human Services, and other state and federal agencies. There is no evidence that Debtor's patient care has been questioned by any board or regulatory agency. |
| Debtor's history of patient care. | Debtor's patient care history is good; no malpractice claims have ever been asserted against Debtor or its professions since Debtor began business in 2006. |
| The ability of the patients to protect their rights. | Patients in New Mexico can and do protect their rights by bringing medical malpractice claims; there is no evidence that Debtors' patients are particularly vulnerable or unable to so hold Debtor accountable. |
| The level of dependency of the patients on the facility. | Patients depend on Debtor remaining open because Dr. Zmily is the only practicing non-hospital physician in Raton; care of patients in and around the Raton area would suffer if the Debtor shut its doors. |
| The likelihood of tension between the interests of the patients and the debtor. | There is no evidence of any tension between Debtor's patients and Debtor. Rather, Debtor needs its patients, and its patients need Debtor. |
| The potential injury to the patients if the debtor drastically reduced its level of patient care. | Patients would be harmed if Debtor reduced its level of patient care because they would have to travel long distances to find other providers. |
| The presence and sufficiency of internal safeguards to ensure appropriate level of care. | Dr. Zmily testified that internal safeguards are in place to ensure an appropriate level of patient care. Debtor uses FDA approved software. |
| The impact of the cost of an ombudsman on the likelihood of a successful reorganization. | The Court has no evidence about what an ombudsman would charge or do. In the Court's only other experience with a patient care ombudsman, the charge was substantial. *See In re Santa Fe Medical Group, LLC*, 557 B.R. 223, 225 (Bankr. D.N.M. 2016). |
| The high quality of debtor's existing patient care. | The current level of patient care seems to be at an acceptably high level. The UST argues that Debtor's decision to treat patients with |

| | BioLab's amniotic fluid-based injections casts doubt on Debtor's patient care. The Court disagrees. It is beyond the scope of this contested matter to determine whether the injection provided a medical benefit, but the uncontradicted evidence is that Dr. Zmily observed a substantial benefit to his patients. Because of that, and because there have been no claims of harm or adverse side effects, administering the injections does not reflect adversely on Debtor's patient care. |
|---|---|
| The debtor's financial ability to maintain high quality patient care. | If the Debtor is not undone by excessive administrative expenses, it should have enough money to reorganize and maintain high quality patient care. |
| The existence of an internal ombudsman program to protect the rights of patients. | There is no such program. Debtor's size does not warrant it. |
| The level of monitoring and oversight by federal, state, local, or professional association programs which renders the services of an ombudsman redundant. | Medical practice in the United States is heavily regulated at the state and federal level. |

The factors weigh heavily against appointing a patient care ombudsman. Debtor provides no inpatient treatment, like a hospital or long-term care facility. Unlike hospital patients or nursing home residents, Debtor's patients do not face the prospect of being turned out on the street if Debtor fails to reorganize. Patient care is good. Debtor will be squeezed for cash until Medicare starts paying post-petition bills. Even then, the practice will not be particularly profitable. The cost of a patient care ombudsman is unknown but could be substantial. Debtor can ill afford any additional administrative expenses.

While bankruptcy courts have no hesitation appointing patient care ombudsmen in hospital and nursing home cases, they are reluctant to do so with small businesses like Debtor. *See, e.g., Smiley Dental*, 503 B.R. at 688 (dentist); *Saber*, 369 B.R. at 638 (plastic surgeon); *Aknouk*, 648 B.R. at 764 (dentist); *Pinellas*, 360 B.R. at 361-62 (administrative support for doctors); *Banes*, 355 B.R. at 535 (dentist). It is not an issue of statutory construction, but rather the conclusion that, with

a typical small doctor's or dentist's office, the benefit of an ombudsman (if any), is substantially outweighed by the attendant expense and disruption.

## CONCLUSION

The Court finds and concludes that Debtor is not a health care business. Alternatively, the Court finds and concludes that the appointment of a patient care ombudsman is not necessary for the protection of Debtor's patients. By a separate order, the Court will grant Debtor's motion to dispense with the appointment of a patient care ombudsman.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: August 17, 2023
Copies to: electronic notice recipients